Filed 1/12/15  P. v. Hammons CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT LEE HAMMONS et al.,<br><br>    Defendants and Appellants. | C069317<br><br>(Super. Ct. No. 09F04716) |

Defendants Robert Lee Hammons and Christina Marie Martinez went to the home of Clayton Skinner to steal gemstones.  During the commission of the robbery and burglary, defendant Hammons brutally killed Skinner by hitting him over the head repeatedly with a steering wheel locking device, the Club.  Convicted of felony murder and other crimes, defendants appeal, raising several contentions of error in the trial court.  Among those contentions of error, they assert, and the Attorney General agrees, that the statute of limitations had run on the crimes other than murder when the prosecution

1

began.  We conclude that the time to prosecute the crimes other than murder had expired before the prosecution in this case began.  Because of that, we vacate the convictions on the crimes other than murder, along with the sentences and fines associated with those crimes.  However, we find none of the contentions with respect to the murder convictions has merit.  We therefore modify the judgment and affirm.

PROCEDURE

The district attorney charged defendants by information as follows:

Count one:  murder (Pen. Code, § 187, subd. (a); hereafter, unspecified code references are to the Penal Code) with the special circumstance of killing while engaged in robbery and burglary (§ 190.2, subd. (a)(17)) and, as to defendant Hammons, with an allegation that he personally used a deadly weapon (§ 12022, subd. (b)(1)).

Count two:  first degree robbery (§ 211), with an allegation that defendants acted in concert (§ 213, subd. (a)(1)(A)).

Count three:  first degree burglary (§ 459).

Count four:  attempted robbery, against defendant Hammons only (§§ 211, 664).

Count five:  assault with a deadly weapon, against defendant Hammons only (§ 245, subd. (a)(1)).

Counts four and five related to a June 2004 incident, and counts one through three related to a July 2004 incident.

The prosecutor tried the murder charge, and the trial court instructed, on a theory of felony murder only – that is, causing death during the commission of robbery and burglary.

A jury found defendants guilty on all counts, and found true all allegations, except count four, as to which the jury could not reach a verdict and the trial court granted a mistrial.

The trial court sentenced defendant Hammons to life without possibility of parole for the murder with special circumstances with an additional determinate term of one

2

year for personal use of a weapon. The court also sentenced defendant Hammons to a determinate term of four years for assault with a deadly weapon. Terms for robbery and burglary were imposed and stayed under section 654.

The trial court sentenced defendant Martinez to life without possibility of parole for the murder with special circumstances. Terms for robbery and burglary were imposed and stayed under section 654.

FACTS

In June and July 2004, defendant Hammons and defendant Martinez lived together as boyfriend and girlfriend in the home of Stacy L., who was the mother of teenagers Ta.H. (13 years old) and Te.H. (14 years old). Defendants were babysitters for Ta.H. and Te.H.. while their mother worked. During those months, two incidents occurred at the home of Clayton Skinner.

*Crimes Against Clayton Skinner*

On June 26, 2004, Clayton Skinner called 911 in the evening. He reported that he had just been robbed and beaten at his home by three Black males. He was beaten on the back with a steering wheel locking device, the Club. Skinner reported that one of the men was about 26 years old and the others were teenagers. The oldest left his shirt at Skinner's home. The police responded to Skinner's home, and he showed them where he had been hit on the back. Later that evening, Skinner called 911 again and reported that he was in pain from the blows to the back.

On July 2, 2004, just after midnight, Skinner called 911 a third time. He reported that one of the assailants from the prior incident was knocking at his door. After Skinner gave the 911 operator some information, he said that it might not be an emergency. And finally, Skinner said it "look[ed] like they want to talk" and that there was no emergency.

On the morning of July 3, 2004, Skinner's father went to Skinner's home. He found blood all over the house and Skinner deceased in the bathroom. Skinner's collection of semi-precious stones that he kept in a small tackle box was missing.

3

When a police detective made contact with defendant Martinez in February 2009, at her home, the detective saw a picture of defendant Hammons and a Valentine's Day card addressed to "my wife." When the detective asked defendant Martinez who was in the picture, she said it was a friend who had died. When the detective asked who the Valentine's Day card was from, she said it was from her brother. Defendant Martinez accompanied the detective to the police station. And when he asked whether she knew defendant Hammons, she denied knowing him, even though they had three children together. The jury was admonished to consider this evidence concerning defendant Martinez's statements as to her only.

*Testimony of Te.H.*

Te.H., who was originally a codefendant in this case, testified as a result of a negotiated plea. He agreed to give truthful testimony in exchange for a guilty plea to a reduced charge of voluntary manslaughter and first degree robbery with a state prison term of 15 years. This negotiated plea and testimony occurred seven years after the crimes, when Te.H.. was an adult.

According to Te.H.., on June 26, 2004, Te.H.., Ta.H., and defendant Hammons went to the parking lot of the AM/PM where Te.H..'s mother and defendant Martinez worked. They sat in and around defendant Hammons's car and smoked marijuana. Skinner approached and invited defendant Hammons to come to his home to see a car that he wanted to sell. Defendant Hammons, with Te.H.. and Ta.H. in the car, followed Skinner to his home.

Te.H.. and Ta.H. got out of the car and went to the front door to go with defendant Hammons to see Skinner's car. While Te.H.. was at the door of Skinner's house, he saw a tackle box with gemstones in it. Ta.H. grabbed the tackle box, but Skinner took it from Ta.H. and told Te.H.. and Ta.H. to go back to the car. Skinner said the stones were precious stones and were not for sale. Te.H.. and Ta.H. returned to defendant Hammons's car, but they went back into the home while defendant Hammons and

4

Skinner were in the garage. Ta.H. took a video game system, and they again went out to defendant Hammons's car. After a few minutes, defendant Hammons ran out of the house with Skinner behind him. Skinner was screaming that he was being robbed. Defendant Hammons got in the car, and they left. While Te.H.. was in Skinner's home, he saw a red Club on the floor.

In the days after the June 2004 incident, defendant Hammons repeatedly told Te.H.. and Ta.H. that they needed to go back to Skinner's home with him to get the gemstones. Defendant Hammons said he wanted them to come with him and he would do everything else. At first, Te.H.. and Ta.H. refused, but they finally agreed. Defendant Hammons also convinced defendant Martinez to go with them.

On July 2, 2004, defendant Hammons, defendant Martinez, Te.H.., and Ta.H. went to Skinner's home in a van owned by Te.H..'s mother and driven by defendant Martinez. Ta.H. went to Skinner's front door. He had with him a cell phone with a call connected to a cell phone in defendant Hammons's possession in the van so that the occupants of the van could hear what was going on. Skinner opened the door, saw who was at the door and pulled out a knife, so Ta.H. ran back to the van.

After Ta.H. returned to the van, defendant Martinez took the phone and went to the front door. She asked Skinner about the car that was for sale. Defendant Martinez was afraid of a dog Skinner had in his home, and Skinner said, "Don't worry, he just wants to smell your pussy." When defendant Hammons heard the comment over the phone, he got upset, banged on the steering wheel, and told Te.H.. and Ta.H. to come with him. The three got out of the van and quietly entered the house.

Inside the house, Te.H.. could hear defendant Martinez and Skinner talking, but he could not see them. Defendant Hammons went upstairs, while Te.H.. and Ta.H. stayed by the front door. Skinner apparently heard something, so defendant Martinez called out to defendant Hammons that Skinner had a knife.

5

Responding to defendant Martinez's warning, defendant Hammons ran down the stairs and picked up the Club, which was on a couch. He struck Skinner in the head with the Club. The first blow knocked the knife out of Skinner's hand. Defendant Hammons continued to hit Skinner in the head until Skinner fell to the floor and lost consciousness.

Once Skinner was unconscious, defendant Hammons gave the Club to Ta.H. and told him to "keep [Skinner] down." Ta.H. hit Skinner with the Club on the back a few times. Defendant Hammons went back upstairs, and Te.H.. told Ta.H. to stop hitting Skinner. Defendant Martinez grabbed some speaker wire and prepared to choke Skinner with it. Skinner attempted to get up but could not.

Defendant Hammons came back downstairs, and the four left the home. Ta.H. took the Club with him. On defendant Hammons's direction, Te.H.. took Skinner's cell phone. After they drove away from Skinner's home, Te.H.. used Skinner's cell phone to make calls, including to his mother. Defendant Hammons told Te.H.. that if he snitched the same thing would happen to Te.H.. and his family as happened to Skinner.

When defendant Hammons was being transported to court during these proceedings in 2011, he saw Te.H.. and called him a snitch, saying, "He's snitchin' on me." This statement was admitted as to defendant Hammons only.

*Interrogation of Defendant Hammons*

Defendant Hammons was interviewed by police in March 2009 and again after he was arrested in June 2009. During the June 2009 interview, he admitted he was present when Skinner was beaten on the second occasion but he claimed he did not participate in the beating. Further details of defendant Hammons's statements are discussed below with respect to his contention that his statements should have been excluded.

6

*Forensic Evidence*

Officer Timothy McMahan responded to Skinner's home after Skinner's 911 call on June 26, 2004. Skinner showed Officer McMahan the injuries on his back, and Skinner gave to Officer McMahan half of a Club, which Skinner said was used to beat him, and the shirt left behind by the assailant. The half of the Club given to Officer McMahan had defendant Hammons's fingerprints on it, and the shirt had defendant Hammons's DNA.

Records of calls from Skinner's cell phone established that Skinner's phone was used to call Te.H..'s home phone number soon after Skinner's last 911 call in the early morning hours of July 2, 2004. After that, calls were made to other people associated with Te.H.. and Ta.H..

An autopsy of Skinner revealed injuries all over Skinner's body and old bruises on his back, but Skinner died from blunt force trauma to the head. There were 17 wounds on Skinner's head, including at least two that went all the way through Skinner's scalp to his skull. His skull was fractured, and a piece of plastic from the Club was found in the fracture. The injuries were consistent with being beaten with the Club. Autopsy photographs are further described below in connection with defendants' contention that the photographs should have been excluded.

DISCUSSION

I

*Denial of Motion to Sever Trials of Defendants*

Defendant Martinez contends that the joinder of her trial with defendant Hammons's trial violated her due process and fair trial rights and that the trial court abused its discretion when it denied her pretrial motion to sever her trial from defendant Hammons's trial. Defendant Hammons joins the contention to the extent it may be favorable to him. The contention is without merit.

7

" ' "Our Legislature has expressed a preference for joint trials. [Citation.] Section 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. . . . [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" [Citation.]' " (*People v. Hajek* (2014) 58 Cal.4th 1144, 1172-1173 (*Hajek*).)

Defendant Martinez argues that denial of the motion to sever was an abuse of discretion and violated her due process rights because (1) defendant Hammons's incriminating statements corroborated Te.H..'s testimony that she participated in the July 2004 crimes against Skinner, (2) it allowed the prosecution to associate defendant Hammons with defendant Martinez as part of the same team, and (3) the jury was likely confused by evidence of the earlier June 2004 assault on Skinner in which she did not participate. None of these arguments establishes an abuse of discretion or violation of defendant Martinez's due process rights.

Concerning defendant Hammons's incriminating statements, defendant Martinez makes no argument that those statements were improperly admitted as to her. Therefore, she fails to establish that they would not have been admissible in her separate trial.

Concerning the association between defendant Hammons and defendant Martinez, there is nothing to suggest that evidence concerning defendant Hammons would not have

8

been admissible in a separate trial of defendant Martinez. "Severance may be justified 'where there may be prejudicial association with codefendants' [citation], but only if, at the guilt phase, 'the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant' [citation]." (*Hajek, supra,* 58 Cal.4th at p. 1175.) Such prejudicial association is not to be found, however, when there is independent evidence (other than the association with the codefendant) linking the defendant to the crime and the jury is properly instructed concerning what evidence can be considered as to the defendant in question. (*Ibid.*)

Here, there was independent evidence linking defendant Martinez to the July 2004 crimes against Skinner, most notably the testimony of Te.H.. concerning defendant Martinez's participation. Also, defendant Martinez does not assert that any evidence admissible only as to defendant Hammons was improperly admitted as to her or that the trial court did not properly instruct the jury concerning how it could use such evidence. (See *Hajek, supra,* 58 Cal.4th at pp. 1175-1176.)

Finally, we have no reason to believe that the jury was confused because there was evidence of two separate incidents in which Skinner was assaulted. Speculation such confusion may have existed does not establish an abuse of discretion in denying the motion to sever or a violation of defendant Martinez's due process rights.

In his joinder on this issue, defendant Hammons argues that evidence admissible only as to defendant Martinez concerning her consciousness of guilt was prejudicial to him and that the jury may not have heeded the trial court's instructions concerning what evidence the jury could consider on the issue of defendant Hammons's guilt. Speculation that the jury may not have followed the court's instructions does not support defendant Hammons's argument that the denial of the motion to sever was prejudicial as to him.

9

Without more, we presume the jury followed the court's instructions. (*Hajek, supra,* 58 Cal.4th at pp. 1175-1176.)

II

*Denial of Motion to Sever Counts*

Defendants also argue that counts four and five, covering the June 2004 assault on Skinner, should have been severed from counts one, two, and three, dealing with the July 2004 crimes. They assert the trial court abused its discretion and violated their due process and fair trial rights by denying their motion to sever. There was no error because the evidence of the crimes was cross-admissible.

Section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." The law favors joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.) Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately. (§ 954; see *People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*).) " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion. (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.) In determining whether a trial court abused its discretion, we consider the record before the trial court when it made it the ruling. (*Thomas, supra,* 53 Cal.4th at p. 798.) "We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried. [Citation.] *If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial.*" (*Ibid.,* italics added.)

Cross-admissibility in both directions is not required. It is sufficient if evidence of one crime is cross-admissible as to the other crime. (*People v. Zambrano* (2007) 41

10

Cal.4th 1082, 1129 ["it is enough that the assaults were admissible in the murder case; 'two-way' cross-admissibility is not required"], disapproved of on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; *People v. Cunningham* (2001) 25 Cal.4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"].)

Defendant Martinez claims that the evidence of the June 2004 crimes against Skinner was not admissible as to the July 2004 crimes because she was not involved in the June 2004 crimes. She is mistaken. The evidence of the June 2004 crimes was relevant to establish the intent to return on July 2004 to steal Skinner's property. During the June 2004 crimes, defendant Hammons and the Holliman brothers saw the tackle box with gemstones in it. They concocted a plan to return to Skinner's home and steal the gemstones, which they apparently thought included precious diamonds. Indeed, the evidence of the June 2004 crimes was admitted at trial, in part, for that very purpose – to show the larcenous intent of both defendants when they went to Skinner's home in July 2004.

Defendant Hammons argues that the counts should have been severed because the evidence on counts four and five was strong while the evidence on counts one, two, and three was weaker. This argument, however, bears no weight because the evidence of the crimes was cross-admissible. (*Thomas*, *supra*, 53 Cal.4th at p. 798.)

The trial court did not abuse its discretion or violate defendants' due process and fair trial rights when it denied the motion to sever counts.

III

*Admission of Hammons's Statement*

Detectives interviewed defendant Hammons twice – in March and then in June, both in 2009. Statements from those interviews were used by the prosecution in the joint trial. On appeal, defendant Hammons contends that his motion to suppress those statements should have been granted because (1) they were involuntary and (2) they were

11

obtained after he requested an attorney. Defendant Martinez contends that (3) admission of the statements also violated her due process rights because the statements were involuntary and therefore were unreliable. Both defendants contend that (4) admission of the statements was prejudicial.

We conclude (1) the statements were not involuntary, and (2) defendant Hammons did not unambiguously request to be represented by counsel. We also conclude that (3) admission of defendant Hammons's statements did not violate defendant Martinez's due process rights. And finally, (4) we need not consider whether admission of the statements was prejudicial.

A.  *Interviews*

1.  March 8, 2009

Detective Kyle Jasperson interviewed defendant Hammons on March 8, 2009, at the police station. Detective Jasperson told defendant Hammons he was not under arrest, but he advised defendant Hammons of his *Miranda* rights at the beginning of the interview because the officers who brought defendant Hammons to the station had placed him in handcuffs. (See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].)

Detective Jasperson asked defendant Hammons if he would take a polygraph test, and that topic comprised a major part of the interview. At various times, defendant Hammons said he would take the polygraph test to establish his innocence, but then he would back off or put conditions on his taking the test. In the end, defendant Hammons did not take a polygraph test that day and eventually was allowed to leave the police station.

During the interview, defendant Hammons denied involvement in the crimes against Skinner. Detective Jasperson asked if he would take a polygraph test, and Hammons responded that he would like to have his mom "or somebody like that" there. He was uncomfortable having the test when no one knew he was there. He mentioned that his mother had said that he should have an attorney ready if anything like this

12

happened.  His brother had a bad experience with a polygraph test, and his brother's attorney had said that he should have an attorney ready for those circumstances.

The give and take over whether defendant Hammons would take a polygraph test went on, and defendant Hammons persisted in the request to call his mother to get her permission.  Detective Jasperson avoided the question, and no progress was made. Defendant Hammons repeated that he did not want to take a polygraph test without anyone knowing what was going on, "[a] family member or lawyer or anything."

After more negotiations over what would happen and questions about whether defendant Hammons was involved in the crime against Skinner, defendant Hammons said, "You know, you making me seem like I need a lawyer right now, because I don't – I don't know – sound like you just ready to – okay, let's do this guy, he's goin to jail." (There was some unintelligible simultaneous talking during this statement.)

After a discussion about whether someone had implicated him in the crime, which defendant Hammons denied, he said, "And I'm not gonna call a lawyer either, 'cause what's the point in doin that?  I – I don't know nothing."

The interview continued, but still without progress toward a polygraph test. Defendant Hammons insisted that he would feel more comfortable if his mother knew about it.  When Defendant Hammons suggested he could call his mother and tell her he was taking the test, he said he wanted his mother and father to come down.

Defendant Hammons said that if he was not allowed to have his family there he would get a lawyer and sue.  Later, he added:  "Um, to be honest, the – the only reason I would do this test is if – if I call my mom and my mom – (unintelligible) – she call my – my lawyer or Christina's lawyer and – (unintelligible) whatever.  I mean, that's the only way I will do it."  Detective Jasperson asked if he wanted to call his mother, and defendant Hammons continued:  "I need to call – call Christina's lawyer first off and my lawyer and everybody was goin to.  Nobody knows what's goin on."

13

Detective Jasperson said that if defendant Hammons was not going to take the test they were done, but defendant Hammons insisted he was willing to take the test. He said: "I'm not making it seem like I don't [want to take the polygraph test] or anything. What I would like to do is, um, before I – I do all this, because the information that you're telling me is – and me personally from – from Christina's experience or anything – I would like to have a lawyer – call a lawyer, let them know what's goin on. I mean, I'm not (unintelligible) about me making an excuse why I need a lawyer before I do this thing – it's just the point of me doin it is because I want to know what's goin on before – 'cause I don't know if I gotta take this test (unintelligible)."

Defendant Hammons said he would not take the polygraph test without an attorney present. Detective Jasperson again explained that defendant Hammons had a right to an attorney and that he did not have to take the polygraph test. To that, defendant Hammons responded that he wanted to clear his name.

The interview went on at length in the same vein. Finally, defendant Hammons said he just wanted to go home; the interview ended; and Detective Jasperson sent him home in a taxi.

During the March 2009 interview, defendant made no admissions concerning his involvement in the Skinner crimes.

2.     June 10, 2009

Three months later, on June 10, 2009, in the morning, Detective Jasperson arrested defendant Hammons on a murder warrant and transported him to the police station, where defendant Hammons was questioned over the course of the next several hours.

When Detective Jasperson arrested defendant Hammons, the detective intended to take him directly to be booked at the jail. However, before they left defendant Hammons's home, defendant Hammons told Detective Jasperson that he was ready to take the polygraph test, so Detective Jasperson took him to the police station to take the polygraph test.

14

Defendant Hammons was placed in an interview room in the morning. After a short delay, Detective Jasperson entered the room and read defendant Hammons his *Miranda* rights. After a short discussion, Detective Jasperson left the room to go make arrangements for the polygraph test. During that time, video recording equipment was in operation in the room where defendant Hammons was being held. While defendant Hammons was alone, he continued to talk, saying things like, "I want me a lawyer," and, "I want my fuckin lawyer." Neither Detective Jasperson nor any other officer monitored defendant Hammons while defendant Hammons was alone in the interview room, so Detective Jasperson did not know about what defendant Hammons had said while he was alone.

When Detective Jasperson returned to the interview room, he asked if defendant Hammons was ready to take the polygraph test. Defendant Hammons responded: "Man. No, I'm not ready. I want my – first of all I want my phone call and I wanna call a lawyer right now." He added: "I'm callin a lawyer. You violated my rights too much man."

The following exchange took place:

"[Detective Jasperson]: Okay. You wanna lawyer instead of taking the test?

"[Defendant Hammons]: Yes, sir. I don't get no (unintelligible) but you know what? You gonna mess with my head, I'm gonna mess with your head.

"[Detective Jasperson]: Well you're not messin with my head. Either you take the test or you don't.

"[Defendant Hammons]: Well you can hold me for 72 hours, I ain't did nothing wrong so –

"[Detective Jasperson]: What was that about 72 hours?

"[Defendant Hammons]: You can only hold me for 72 hours so –

"[Detective Jasperson]: No, no I can hold you indefinitely. You're under arrest.

"[Defendant Hammons]: For what?

15

"[Detective Jasperson]:  For murder.  [¶]  . . .  [¶]

"[Detective Jasperson]:  If you don't wanna take the test, then that's fine we'll go to the jail instead.

"[Defendant Hammons]:  Why I'm goin to jail?  See now – now – now you're playing all the bullshit now.  (Unintelligible)  I'll take the test, that's a problem –

"[Detective Jasperson]:  Hey either –

"(SIMULTANEOUS TALKING)

"[Detective Jasperson]:  You know we're not gonna play games like last time.  If you –

"[Defendant Hammons]:  I didn't play no games the last time.

"[Detective Jasperson]:  You have – I read you your rights.  You have the right to an attorney if you want an attorney.  I'm not gonna prevent you from doin that, but either – you said you were gonna take the test so I'm giving you the option to do that and try and move [*sic*] your innocence but if you don't wanna do that, then that's fine.  We'll – we'll go to jail right now.  Do you wanna take the test or not?

"[Defendant Hammons]:  (Unintelligible) take the test.  Would you –

"[Detective Jasperson]:  Okay.  Then come on."

At that point, defendant Hammons was taken to a different room where Detective Keller administered a polygraph test.  After the test, Detective Keller told defendant Hammons he had failed when answering whether he was involved in the Skinner crimes.  After discussing the polygraph test and asking for the opportunity to take the test again, defendant Hammons said that he had "seen it" but did not do it.  He added that he had seen someone hit "the old white guy" at the AM/PM.  Detective Keller continued the interview, encouraging defendant Hammons to tell the truth, while defendant Hammons continued to claim that he did not hit Skinner.

Detective Keller continued to urge defendant Hammons to tell the truth and warned him that it was too late to say that he did nothing wrong and that he should think

16

of his children and his future. Defendant Hammons became upset about not being able to see or talk to his children.

When Detective Keller expressed frustration and stood to leave, defendant Hammons begged him to sit down and stay. Defendant Hammons admitted that he had been at the house when it happened. However, defendant Hammons then backtracked and said Ta.H. and Te.H.. beat Skinner at the AM/PM. At that point, Detective Keller took defendant Hammons back to the interview room where Detective Jasperson had interviewed him.

Detective Keller and defendant Hammons continued to talk in the first interview room. Detective Keller said that if defendant Hammons was not going to tell the truth he was leaving. Defendant Hammons claimed that Ta.H. and Te.H.. beat Skinner at the house and that he and defendant Martinez stood at the door and watched. After Detective Keller said he was done talking to defendant Hammons if he was not going to admit that he beat Skinner, defendant Hammons asked to speak to Detective Jasperson again. He told Detective Jasperson that he fought with Skinner the first time they went to the house, but he did not touch Skinner the second time.

Further details of the interview are discussed below in connection with defendant Hammons's contentions.

After a hearing on the interviews, the trial court, in a thorough and wide-ranging ruling, concluded that defendant Hammons's statements were voluntary (because the tactics used were not coercive) and that he did not make an unambiguous request for an attorney.

Concerning whether the statements were involuntary, the court said: "I just don't find coercion here that overcame any desire by the defendant not to talk with police. In fact, just the opposite. It's the defendant who repeatedly and continually does want to talk to the officers." Defendant Hammons used his assurances that he wanted to cooperate to try to deflect blame.

17

Concerning a request for an attorney, the trial court found that defendant Hammons's statements about wanting an attorney had to do with whether to take the polygraph test and whether to sue the police for violation of his rights. He did not communicate to the detectives that he did not wish to talk to them without an attorney. During the March 2009 interview, defendant Hammons indicated that he wanted to talk to an attorney before taking the polygraph test, so no test was administered. During the June 2009 interview, defendant Hammons mentioned an attorney several times. However, each time, when the statement was clarified, he wanted an attorney before taking the polygraph test or to talk to about his rights being violated. Defendant Hammons admitted that he was trying to "mess with" Detective Jasperson's head. None of defendant Hammons's statements about an attorney constituted an unambiguous request to have an attorney for the purpose of police questioning.

On whether defendant Hammons understood his *Miranda* rights, the court noted: "I don't see any question about that. They were given to him a number of times. He said he understood them, and he was told it was never too late to invoke them."

B. *Contentions*

1. Voluntariness of Statements

A statement is involuntary if it is "not ' "the product of a rational intellect and a free will." ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 304].) "The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.' [Citations.]" (*Dickerson v. United States* (2000) 530 U.S. 428, 434 [147 L.Ed.2d 405, 413], quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862].) This test "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. [Citation.]" (*Dickerson v. United States*, *supra,* at p. 434.) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process

18

Clause of the Fourteenth Amendment." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484].) Coercive police activity, however, " 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404-405; see also *People v. Williams* (1997) 16 Cal.4th 635, 659 ["confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity"].)

As the trial court noted, defendant Hammons repeatedly expressed his willingness, even eagerness, to talk to the detectives. However, defendant Hammons focuses on several circumstances during the June 2009 interview that he claims establish his will was overborne and that caused him to make involuntary statements. Those circumstances are: (1) defendant Hammons stated he was not good at reading and writing; (2) the detectives "mischaracterized" the felony-murder rule, leading defendant Hammons to believe that he was not as culpable if he did not participate in the beating; (3) the detectives used subterfuge (although defendant Hammons concedes the tactic is not constitutionally prohibited); (4) the detectives did not give defendant Hammons a phone call and a cigarette when he repeatedly asked for them; and (5) the detectives told him he was going to jail (although defendant Hammons concedes he was under arrest on a murder warrant).

Defendant asserts that his statement was involuntary, and therefore inadmissible, because, considering the totality of the circumstances, his statements were "the result of a number of techniques to overbear that freedom of will and to impair [his] capacity for self-determination." To the contrary, considered individually and collectively, the techniques used by the detectives in questioning defendant Hammons were acceptable and not overbearing. The interviews occurred during the day. Defendant Hammons knew that he had the right to remain silent and to request an attorney and that he could invoke those rights at any time. Although defendant Hammons asked for a phone call, he

was not entitled to make a phone call. While defendant Hammons asked several times for a cigarette, his possible craving for nicotine did not make him say anything involuntarily. And telling defendant Hammons that if he did not want to talk they would take him to jail was plainly true. Indicia of involuntariness are absent here.

2. Request for an Attorney

Whether an accused actually invoked his right to counsel is an objective inquiry. (*Davis v. United States* (1994) 512 U.S. 452, 458-459 [129 L.Ed.2d 362, 371].) " '[A] statement either is such an assertion [of the right to counsel] or it is not.' [Citation.]" (*Smith v. Illinois* (1984) 469 U.S. 91, 97-98 [83 L.Ed.2d 488, 495].) Because what defendant Hammons said during his police interview is largely undisputed, "we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.) We conduct our analysis " 'in view of the entire record.' " (*Id*. at pp. 1105-1106.)

A suspect must unambiguously request counsel and "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States, supra,* 512 U.S. at p. 459.) "If 'a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel,' questioning need not cease. [Citation.]" (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1127, italics omitted.) While declining to adopt a rule requiring an officer to ask clarifying questions, the Supreme Court has observed that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." (*Davis v. United States*, *supra,* at p. 461.)

As the trial court concluded, defendant Hammons, during the March 2009 interview, mentioned an attorney only in relation to letting an attorney know he was there or talking to the attorney about taking a polygraph test. Looking at the March 2009

20

interview as a whole, it was an extended negotiation about whether defendant Hammons would take a polygraph test. In the end, he did not take the polygraph test and did not admit any involvement in the Skinner crimes.

Again in the June 2009 interview, defendant Hammons's statements about an attorney had to do with whether to take the polygraph test or whether to sue the police for violating his rights. Contrary to his current position, he made it clear during the interview that he desired to talk to the detectives to try to clear his name.

In his brief on appeal, defendant Hammons takes some of his statements about an attorney out of context and declares that those statements were an unambiguous request for counsel to represent him in questioning. To the contrary, each time defendant Hammons spoke about wanting an attorney it was in connection with taking the polygraph test or suing the police for violating his rights. To the extent there was ambiguity, the detectives asked defendant Hammons to clarify, and invariably he demonstrated his desire to continue to talk to the detectives without an attorney at that time. Defendant Hammons even admitted that his statements about an attorney were meant to "mess with" the detective's head.

In short, defendant Hammons never made it reasonably clear to the detectives that he was requesting to have counsel present during the interviews. (See *Davis v. United States, supra,* 512 U.S. at p. 459; *People v. Gonzalez, supra,* 34 Cal.4th at p. 1127.)

### 3. Reliability of Statements

Defendant Martinez contends that if defendant Hammons's statements to police were inadmissible because they were involuntary, admission of those statements against her violated her due process rights because the statements were inherently unreliable. We have concluded that defendant Hammons's statements were not involuntary; therefore, defendant Martinez's claim that her due process rights were violated by admission of involuntary statements is without merit.

21

4.     Prejudice

Because we conclude that there was no error in admitting defendant Hammons's statements from his interviews with the detectives, it is unnecessary to determine whether admission of those statements was prejudicial.  However, we note that there was ample evidence, aside from defendant Hammons's statements, that he and defendant Martinez were present at the scene when Skinner was murdered and that they had an active role in the crimes committed there.

IV

*Admission of Autopsy Photographs*

Defendants argue that the trial court's admission of photographs of the murder victim, over their objections, was an abuse of discretion and violated their due process and fair trial rights.  We disagree.

*Procedure*

Defendants objected to admission of several autopsy photographs of Skinner based on Evidence Code section 352.  The admitted photographs, as relevant to this appeal, included People's exhibits 83, 85, 86, and 90.

Exhibit 83 showed the top of Skinner's head, with several lacerations visible through his hair.  The head had already been cleansed to wash away most of the blood.

Exhibit 85 showed the top of Skinner's head after the head had been shaved.  The same lacerations are more visible, as is a piece of plastic (part of the Club) sticking out of one of the wounds.

Exhibit 90 showed the top of Skinner's head with the skin of the scalp peeled back and the piece of plastic protruding.  The photograph showed bleeding in the last layer of soft tissue over the skull.

Exhibit 86 showed the top of Skinner's head with the skin and scalp removed to expose the bone of the skull, making visible the cracks in Skinner's skull and a hole in the skull.

22

Defendants argued in the trial court that the cause of death was irrelevant because this was a felony-murder case. The prosecution noted that the autopsy photographs were evidence of the extent of Skinner's injuries. The photographs were probative on the issue of whether defendant Hammons personally used a weapon because they showed that a piece of the Club, with which defendant Hammons had been associated in the previous assault on Skinner, was embedded in Skinner's head. Defendants, however, argued that the pathologist could use diagrams, instead of the autopsy photographs, to show the injuries.

During pretrial proceedings, the trial court ruled that exhibit 83 would be admissible. Later, during trial, the court denied defendants' motion to exclude exhibit 90. However, it appears that the trial court never ruled on the admissibility of exhibits 85 and 86.

The trial court noted that exhibit 90 provided evidence of the amount of force used against Skinner. It connected the Club to the crime, and the photographs were relatively closeup, not showing a grotesque picture of decay or similarly upsetting circumstances.

In addition to the autopsy photographs admitted into evidence, Dr. Mark Super, the pathologist, used diagrams to show where the injuries were on Skinner's head. Dr. Super testified that extreme force was required to inflict the injuries to Skinner's head and to embed the piece of plastic in Skinner's skull. He concluded that blunt force trauma to the head caused Skinner's death and that the injuries could have been inflicted with the Club.

*Law and Analysis*

Defendants' contention that the trial court abused its discretion in admitting exhibits 85 and 86 was forfeited because defendants did not secure a ruling on their objection to those exhibits. " '[T]he absence of an adverse ruling precludes any appellate challenge.' [Citation.] In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point. That is the rule. No exception is available."

23

(*People v. Rowland* (1992) 4 Cal.4th 238, 259.) An in limine motion may preserve an objection for appeal, but "the proponent must secure an express ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171.)

As for exhibits 83 and 90, the trial court did not abuse its discretion.

" ' "The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. [Citation.] 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " ' [Citation.] . . . [¶] That the challenged photographs may not have been strictly necessary to prove the People's case does not require that we find the trial court abused its discretion in admitting them. '[P]rosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.' [Citation.] 'The fact that the photographic evidence may have been cumulative to other evidence does not render it inadmissible [citation], although the trial court should consider that fact when ruling on a motion to exclude evidence pursuant to Evidence Code section 352.' [Citation.] A court's ruling admitting such photographs will not be disturbed on appeal unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 191-192.)

Here, even though the murder theory was felony murder, which meant that the prosecution was not required to establish intent with respect to the homicide, the prosecution alleged that defendant Hammons personally used a deadly weapon. The autopsy photographs were relevant to this question because of the force used (defendant Hammons was the lone adult male among the participants) and the presence of the piece of plastic from the Club, which defendant Hammons had used to assault Skinner previously. The amount of force was also relevant to whether defendant Hammons was

present and thus guilty of felony murder because it could be argued he was the only one physically capable of inflicting the blows. The evidence connecting defendant Hammons to the crimes was also relevant to proving defendant Martinez was guilty because of her close association with defendant Hammons, which contributed to a finding that she was present during the crimes. Whether the autopsy photographs may have been cumulative to the testimonial evidence and diagram presented by Dr. Super concerning the injuries is of no consequence here. There was no abuse of discretion in also admitting the photographs. (*People v. Mills, supra,* 48 Cal.4th at pp. 191-192.)

Defendants argue that the Attorney General cannot rely on appeal on the theory that the force used, as seen in the photographs, tends to prove that defendant Hammons, who was the lone adult male involved, inflicted the blows because that is not the specific theory of admissibility the prosecutor cited in the trial court. They are mistaken. An appellant challenging a ruling of the trial court is limited to the arguments made in the trial court. On the other hand, a respondent defending the ruling may argue that the ruling was correct on any grounds because we uphold a judgment, or ruling, if it is sound on any grounds. (See *People v. Boulter* (2011) 199 Cal.App.4th 761, 767.) Indeed, we can reverse the judgment only if prejudicial error is shown. (Cal. Const., art. VI, § 13.)

Defendants' contention concerning the autopsy photographs is without merit.

V

*Former CALCRIM No. 400*

Defendant Martinez contends that the trial court's use of a former version of CALCRIM No. 400 to instruct the jury that a defendant is "equally guilty" whether that defendant is the direct perpetrator or an aider and abettor was error. As we recently held in *People v. Lopez* (2011) 198 Cal.App.4th 1106, at pages 1118 and 1119 (*Lopez*), defendant Martinez forfeited this contention because she did not raise it in the trial court and ask for a modification of the instruction, which generally states the law correctly.

25

The trial court instructed the jury with former CALCRIM No. 400, which stated: "A person may be guilty of committing a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." An April 2010 revision eliminated the word "equally," so the instruction now reads, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400 (2011) p. 167.) However, in instructing the jury in this case, the trial court used the older language.

"Generally, a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime. (§ 31; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122–123.)

"However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1114–1122 [an aider might be found guilty of first degree murder, even if shooter is found guilty of manslaughter on unreasonable self-defense theory]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577–1578 [aider might be guilty of lesser crime than perpetrator, where ultimate crime was not reasonably foreseeable consequence of act aided, but a lesser crime committed by perpetrator during the ultimate crime was a reasonably foreseeable consequence of the act aided].)

"Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on [the defendant] to request a modification if she thought it was misleading on the facts of this case. Her failure to do so forfeits the claim of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [party may not claim 'an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language']; see *People*

26

*v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163–1165 [] [challenge to CALCRIM No. 400 forfeited for failure to seek modification]; but see *People v. Nero* (2010) 181 Cal.App.4th 504, 517–518 [] [construing CALJIC No. 3.00, also using the 'equally guilty' language, and finding it misleading 'even in unexceptional circumstances'].)" (*Lopez, supra,* 198 Cal.App.4th at pp. 1118-1119, italics and fn. omitted.)

Defendant Martinez contends *Lopez* was wrongly decided. Since we believe the reasoning in *Lopez* is sound, we decline to reconsider the issue.

VI

*Prosecutorial Misconduct – Reasonable Doubt*

Defendants argue that the prosecutor committed misconduct and violated their due process rights when she used a graphic to help explain the concept of reasonable, as opposed to unreasonable, inferences to the jury during closing argument. The Attorney General responds that defendants forfeited review of this issue because they did not make a timely objection and, in any event, the graphic and its use by the prosecutor were not objectionable. We conclude defendants forfeited consideration of this issue on appeal by failing to make a timely objection or to request the court to admonish the jury to disregard the prosecutor's graphic. Even were we to conclude consideration of the issue was not forfeited, we would conclude there was no prejudicial misconduct.

In *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*), "we caution[ed] prosecutors who are tempted to enliven closing argument with visual aids that using such aids to illustrate the 'beyond a reasonable doubt' standard is dangerous and unwise." (*Id.* at p. 1269.) Here, the prosecutor ignored our advice, requiring us to determine whether use of the visual aid constituted prejudicial error.

In the prosecutor's closing argument, she argued that there was no reasonable doubt that defendants were guilty. She said that some of the defense arguments "asked [the jurors] to basically set your common sense aside and make inferences of facts and evidence on this case that are simply not reasonable. They are not reasonable, logical

inferences using your common sense as a juror. You can't make those leaps. They have no basis in common sense, basis and reason and logic." (*Sic.*) The prosecutor asked the jurors to view the inconsistencies in Te.H.'s testimony as minor failures of recollection, not as indications of untruthfulness. The prosecutor reviewed jury instructions on reasonable doubt and witness credibility, and she argued that Te.H.. was credible as to the important details of this case.

In this context, the prosecutor displayed a color graphic, titled "THE UNIVERSE OF POSSIBILITIES." The graphic contained two concentric circles. The smaller circle (fully contained in the larger circle) was red in color and contained the text "REASONABLE," in a yellow font. The remaining area of the larger circle was dark blue in color and contained the text "Possible but *Unreasonable* based on the evidence," in a white font. Finally, outside the larger circle appeared the text, "Impossible," in a white font in four separate places.

While showing this graphic, the prosecutor said:

"This visual that I want to show you makes that point [viewing the evidence in context] exactly in how you assess the evidence in this case and the burden in this case. . . . [¶] . . . The universe of possibility is what the defense has in their job to do is to kind of give you all of these inferences that you can try to make from the evidence. And, of course, I mean, you could take, just like that picture close up, there's a lot of possibilities when you look at something very close up. [¶] But the point of this is to remind you of just that, what my burden is, beyond a reasonable doubt. But it's not this universe of possibilities because you can sit in the jury room and inevitably and talk about the universe of possibilities of interpretation of evidence. But that's not what the law tells you to do on reasonable doubt. [¶] You have impossible – you have impossible interpretations, inferences, based upon evidence that we've given you, ones that are just completely impossible, couldn't have happened that way. Then you have, well maybe that's possible but it's just not reasonable based upon everything else that you know. [¶]

28

And that's what a majority of the defense summation approach to you is. There's all these possible interpretations. Well, you could interpret somehow, apparently, you can interpret [defendant Hammons's] confession as something other than that. That is possible. It is absolutely, completely unreasonable to interpret that videotaped interview of [defendant Hammons] as anything other than a confession." (*Sic*.)

After this discussion of the graphic, the prosecutor focused on defense arguments that urged possible, but unreasonable, interpretations of the evidence. And, finally, the prosecutor again urged the jury to use common sense and consider the entirety of the evidence.

During the prosecutor's argument, neither defendant objected to the use of the color graphic. After argument concluded, the court gave the jury some final instructions and sent them off to deliberate. And the court obtained several stipulations about procedure from the parties.

When the court asked the parties if there was anything further to put on the record, counsel for defendant Hammons said: "I did want to say one thing. I didn't object when it was done because I didn't know it was going to happen. The prosecutor displayed to the jury a visualization trying to depict a reasonable doubt and what was unreasonable and what was possible doubt. [¶] My objection is that that was an attempt to minimize the standard of beyond a reasonable doubt and by visualizing in form what constitutes reasonable doubt, what's unreasonable, and what's possible. So I have an objection to – I should have raised an objection at the time. I didn't because I didn't know that was going to happen until it happened right in front of the jury. [¶] So I'm asking that that document be marked as an exhibit relative to this motion and based thereon, remedy – the only remedy at this stage I could ask for the Court to declare a mistrial. [¶] But I think it was an improper attempt to minimize the standard of reasonable doubt by showing some kind of depiction that shows a volume of what's reasonable, a volume of what's

29

unreasonable in visual form, and a volume of what's possible, which I would contend was improper." (*Sic*.)

Counsel for Martinez joined in the objection.

Responding to defendant Hammons's belated objection, the trial court said that "[t]here was no objection at the time." The court added that it did not believe that the graphic used by the prosecutor "raises the issues that you are addressing," and it did not agree with defendants' argument that the graphic was improper.

Defendants forfeited their objections to the prosecutor's use of the graphic during closing argument by failing to interpose a timely objection and to ask the court to admonish the jury. " ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) As the trial court noted, defendants did not make a timely objection; they waited until arguments ended and the jury had begun deliberations. Also, they asked the court to declare a mistrial, but they did not request the court to admonish the jury to disregard the prosecutor's graphic. Having failed to make a timely objection and to request the court to admonish the jury, defendants may not now complain on appeal that the prosecutor's use of the graphic violated their due process rights.

Even if we were to conclude that defendants did not forfeit their objection to the prosecutor's use of the graphic and further assuming without deciding that the use of the graphic constituted prosecutorial misconduct, we would also conclude that any prosecutorial misconduct in using the graphic was harmless beyond a reasonable doubt under the circumstances of this case.

" 'The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they

infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.]" ' [Citation.]

" 'Although counsel have "broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law. [Citation.]" ' [Citation.] In particular, it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]" (*Katzenberger, supra,* 178 Cal.App.4th at p. 1266.)

In *Katzenberger*, the prosecutor addressed proof beyond a reasonable doubt in closing argument. After first quoting part of the jury instruction on that issue, she used a PowerPoint presentation to illustrate the concept. Initially, six pieces of an eight-piece puzzle of the Statue of Liberty appeared. The prosecutor then argued there was no reasonable doubt what the six pieces showed. (*Katzenberger, supra,* 178 Cal.App.4th at pp. 1264-1265.) The Statue of Liberty was almost immediately recognizable, and a juror might guess what the pieces depicted after only one or two were shown. (*Id.* at p. 1267.)

We held that showing the PowerPoint of the puzzle was prosecutorial misconduct because (1) it left "the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence," "invit[ing] the jury to guess or jump to a conclusion . . . ." (*Katzenberger, supra,* 178 Cal.App.4th at p. 1267) and (2) it "inappropriately suggest[ed] a specific quantitative measure of reasonable doubt, i.e., 75 percent" (*Id.* at p. 1268). (See also *People v. Otero* (2012) 210 Cal.App.4th 865, 867 [similarly finding prosecutorial misconduct when the prosecutor used a graphic that, according to the court, "trivialize[d]" the beyond-a-reasonable-doubt standard].)

Here, the graphic used by the prosecutor did not suggest, as did the graphic in *Katzenberger*, that the reasonable doubt standard could be met with just a few pieces of evidence from which the jury could jump to the conclusion that defendants were guilty.

31

Indeed, even though the graphic was not labeled as such, the prosecutor made it clear that "impossible," "unreasonable," and "reasonable" applied to *inferences* not to *doubt*. However, the graphic in this case could be seen as a quantification of what inferences are reasonable and what inferences are not reasonable as it relates to whether any doubts on the jury's part were reasonable. The circle in the center of the diagram, labeled "REASONABLE," occupies about 23 percent of the larger circle representing all possible inferences. From that, the jury may have been led to believe that only about one-fourth of possible inferences are reasonable. That would be an improper conception of inferences and how they relate to the beyond-a-reasonable-doubt standard. While it is unlikely the jury actually concluded that about 23 percent of all possible inferences are reasonable inferences, based on this graphic, the prosecutor introduced that possibility by ignoring our caution not to use graphics in explaining the reasonable-doubt standard.

Recently, the California Supreme Court reversed a conviction obtained after a prosecutor, in an argument similar to the one used in *Katzenberger*, attempted to represent the beyond-a-reasonable-doubt standard by using pieces of evidence suggesting a familiar conclusion. (*People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*).) In *Centeno*, the prosecution used descriptions of a state, suggesting that the state was California, even though some of the descriptions of California were incomplete and inaccurate. The prosecutor argued that, despite the incomplete and even inaccurate descriptions, it was clear beyond a reasonable doubt that the state described was California. (*Id.* at pp. 665-666.) The Supreme Court concluded this was prejudicial misconduct and reversed, even though the issue had been forfeited, because trial counsel's failure to object violated the defendant's right to counsel. (*Id.* at pp. 674-678.) *Centeno*, however, is distinguishable from this case for the same reasons we distinguish *Katzenberger*: the diagram used in this case did not suggest that the reasonable doubt standard could be met with just a few pieces of evidence from which the jury could jump to the conclusion that defendant was

32

guilty. Instead, the diagram here related to the reasonableness of inferences to be drawn from the evidence.

In any event, even if the prosecutor's use of the chart was misconduct, it was harmless beyond a reasonable doubt. (See *Katzenberger, supra,* 178 Cal.App.4th at p. 1269 [applying beyond-a-reasonable-doubt standard to this type of prosecutorial misconduct].)

The jury was properly instructed by the trial court on the reasonable-doubt standard. The court also instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Finally, the court instructed the jury appropriately on how to evaluate the credibility of witnesses.

The prosecution's case against defendants featured direct and circumstantial evidence that defendants were guilty of felony murder. The jury credited Te.H..'s testimony, which he gave after pleading guilty to voluntary manslaughter in connection with the killing of Skinner, and that testimony implicated both defendants in the crimes. Defendant Hammons's statement established that he and defendant Martinez were involved in the crimes committed against Skinner in July 2004. Defendant Hammons's shirt and fingerprints (on the Club) were recovered from Skinner's home after the June 2004 incident, and defendant Martinez demonstrated a consciousness of guilt by trying to disassociate herself from defendant Hammons when police were investigating in 2009. The evidence was strong that Skinner was killed during a robbery and burglary in which both defendants participated.

We perceive no way that the chart used by the prosecutor in trying to explain reasonable inferences affected the jury's findings of guilt, considering the instructions the court gave to the jury and the evidence presented by the prosecution. Accordingly, any prosecutorial misconduct in using the graphic to help explain the concept of reasonable doubt was harmless beyond a reasonable doubt.

33

## VII

### *Jury Misconduct*

Defendants contend that the jury committed misconduct by preparing a card to be given to the victim's family after the trial was over. They also contend the trial court erred by not investigating the incident. We conclude there was no misconduct and no duty to investigate further.

A.    *Procedural Background*

The jury was instructed not to allow sympathy to affect its verdict. The court said: "Do not let bias, sympathy, prejudice, or public opinion influence your decision."

When the jury wrapped up its deliberations and informed the court, through the bailiff, that it had reached verdicts on all but one of the counts, the jury gave a card in a sealed envelope to the bailiff to give to the deputy district attorney for delivery to the victim's family after the trial. The trial court had the card returned, unopened, to the jury. The court wrote to the jury: "Once the jury is discharged, you may communicate individually or collectively with the district attorney, the Skinner family, defense counsel, or anyone else you desire."

Assuming that the card was a sympathy or condolences card, counsel for defendant Martinez argued that the card was a violation of the jury instruction not to be swayed by sympathy. Based on this argument, counsel requested that the court make further inquiry into the circumstances. The court said it would rather "go with the verdict at this point."

Counsel for defendant Hammons argued that the card was prima facie evidence of jury misconduct. He also asked for further investigation.

The prosecutor argued that the card was not evidence of jury misconduct, and the trial court agreed. There was no evidence of contact between the jury and the victim's family. The jury did not try to give something to the victim's family surreptitiously. And there was no showing at all that the jury's verdict was influenced by sympathy. The

34

court concluded: "There's no dispute that Mr. Skinner was killed and he was killed very violently. . . . [¶] The loss to the victim's family was never a matter that was in dispute. The question is who did it[,] and[ i]f it was one of the defendants in this case, what level of culpability. But this is not a case where the fact that they would have sympathy for the victim's family shows anything about their deliberations on the issues before them because the victim's death, the loss suffered by the victim's family was never [] in dispute. [¶] I'm inclined to leave the record where it is. The facts are on the record. If the verdicts are guilty on one or more counts, then defense wants to pursue a motion for new trial, they can make the argument at that time."

At sentencing, the court raised the issue of the card and asked counsel for defendant Hammons whether there was anything further to add. Counsel for defendant Hammons said there was nothing to add. He had spoken to a juror, but he did not have any information to add to the court's understanding. The prosecutor said that defense counsel had spoken with a juror, who said that the card had not affected the jury's deliberations. Counsel for defendant Martinez said that he talked to a juror who said that the card expressed condolences to the victim's family. The juror told counsel that the card had been discussed generally by the jury but it had no effect on her verdict.

B.    *Analysis*

1.    Alleged Jury Misconduct

Section 1181 enumerates the grounds for motions for new trials in criminal cases. One of these grounds is "[w]hen the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented . . . ."

The record does not support defendants' contention that the jury committed misconduct. The jury was instructed not to allow sympathy to influence its verdicts. We presume in the absence of evidence to the contrary, that the jury followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The jury was not instructed not to have sympathy for the victim's family, and any such instruction would

35

have been unrealistic and dehumanizing.  Indeed, it would be odd if a jury did not have sympathy for the homicide victim's family in a case like this.  (See *People v. Vance* (2010) 188 Cal.App.4th 1182, 1188 [sympathy for victim "natural"].)  The court's instruction rightfully was limited to a warning against allowing sympathy to influence the verdicts.

Also, this is not the type of case where sympathy for the victim's family would likely influence a verdict.  As the trial court noted, it is indisputable that Skinner was killed.  There was no evidence or argument that he was killed in self-defense or any other theory casting blame on Skinner.  In other words, there was nothing about this case that pitted defendants against Skinner.  Skinner was killed; the only questions involved whether and how defendants participated.

Defendant Hammons speculates that the victim's family attended the trial "seeking closure," and that returning a not guilty verdict "would be a turning of the knife in the wound and appear hypocritical."  There is no basis in the record for this speculation concerning the motivation of the victim's family.

Defendant Martinez asks:  "Why would the jurors make that specific request [that the deputy district attorney deliver the card to the victim's family], unless they identified themselves with the district attorney's office?  (Unnecessary bold text omitted.)  This question proves nothing, neither does it raise a doubt about the jury's freedom from bias.  Most likely, the jury believed the deputy district attorney would have access to the victim's family.  That does not evince bias or any other sentiment toward the district attorney's office.

Defendant Martinez also finds it "suspicious" that the jury gave the bailiff the card in a sealed envelope.  She claims that this circumstance showed the jurors "did not want the court to know the contents of the card."  To the contrary, there is nothing suspicious about sealing a card, probably a card expressing condolences, before passing it to the victim's family through a third party.

There was no showing of prejudicial misconduct by the jury.

### 2. Trial Court's Refusal to Investigate

" '[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact.' [Citation.] '[A hearing] should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 581-582.)

As discussed above, there was no evidence demonstrating a strong possibility that prejudicial misconduct occurred. There was no evidence that the jury allowed its sympathy for the victim's family to affect its verdict. Therefore, the trial court did not abuse its discretion by refusing to investigate further.

## VIII

### *Statute of Limitations for Burglary, Robbery, and Assault*

Defendants contend that their convictions on counts two (first degree robbery, § 211), three (first degree burglary, § 459), and five (assault with a deadly weapon, § 245, subd. (a)(1) – against defendant Hammons only) must be reversed because prosecution for those crimes began after the statute of limitations had run. The Attorney General agrees, as do we.

Criminal prosecution begins, as relevant to this case, when a complaint is filed or an arrest warrant is issued. (§ 804.) And criminal prosecution for any crime punishable in state prison for a maximum of less than eight years must begin within three years after

37

the crime was committed. (§ 801.) Because first degree robbery, first degree burglary, and assault with a deadly weapon all have maximum sentences of less than eight years in state prison (§§ 213, subd. (a)(1)(B) – six years for first degree robbery; 461, subd. (a) – six years for first degree burglary; 245, subd. (a)(1) – four years for assault with a deadly weapon), the statute of limitations required that prosecution of those crimes begin within three years after the crimes were committed.

Here, the crimes were committed in June and July 2004, and prosecution for those crimes began on June 10, 2009, when the complaint was filed. Therefore, prosecution began almost five years after the crimes were committed, long after the period to prosecute the crimes had expired for counts two, three, and five.

The arrest warrant does not appear in the record on appeal, but the Attorney General concedes that it was not issued within the statute of limitations for counts two, three, and five.

A claim that a conviction is barred by the statute of limitations may be raised at any time, even for the first time on appeal. (*People v. Morris* (1988) 46 Cal.3d 1, 13, fn. 4, overruled on another issue in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.) We therefore must vacate the convictions for the crimes alleged in counts two, three, and five, along with the sentences and fines associated with those counts.

IX

*Constitutionality of Special Circumstances Statute*

To preserve the claim for federal review, defendants contend that the special circumstances statute is unconstitutional, even though the California Supreme Court has rejected this challenge. (See *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 [rejecting challenge that California special circumstances statute did not adequately narrow the class of death-eligible defendants].) As defendants properly acknowledge, we are bound by the California Supreme Court precedent. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.) Therefore, we need not consider the matter further.

38

X

*Crime Prevention Fine*

Section 1202.5 requires the trial court to impose a $10 fine "in any case" involving robbery or burglary, among other crimes. (§ 1202.5, subd. (a).) Defendants argue that the trial court improperly imposed two section 1202.5 fines for the convictions in counts two and three, rather than just one fine for the "case." We need not consider the merits of this argument because the convictions on which the fines were based, counts two (first degree robbery) and three (first degree burglary) must be vacated, as discussed above. The fines must also be vacated.

XI

*Abstract of Judgment*

Defendants contend that the abstracts of judgment relating to the determinate terms imposed incorrectly reflect the judgment of the court. Because the determinate terms were for counts two, three, and five, which must be vacated, we need not consider whether the abstracts properly reflected the court's judgment.

DISPOSITION

The convictions on counts two, three, and five are vacated, along with their associated sentences and fines. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment as to each defendant and to send the amended abstracts to the Department of Corrections and Rehabilitation.

        NICHOLSON      , Acting P. J.

We concur:

      HULL           , J.

      DUARTE       , J.

39